Mistry versus Qualcomm and counsel whenever you're ready. I'm waiting for the host to start my video, your honors. Okay, we can see you. Thank you, your honor. May it please the court. I'm Joseph Daly for the plaintiff appellants. I'm going to reserve three minutes for rebuttal. Your honors, the complaint here alleges with particularity the defendant's intentional or deliberately reckless misstatements and omissions. In a nutshell, despite secretly approaching CFIUS and asking that agency to review the Broadcom deal ahead of its completion with a specific aim of having it blocked, the defendants instead did three things publicly. They repeatedly reassured Qualcomm investors that they were negotiating with Broadcom in good faith and simply trying to maximize shareholder value. They understated the actual heightened regulatory risks that their own actions had created and they misled Qualcomm investors as to the likelihood that the deal would go through. This was paradigmatic securities fraud. The defendants created a misleading impression of the true state of affairs surrounding the possible deal. So counsel, what is your view that with regard to CFIUS, what is your view as to what the defendants needed to say to avoid false or misleading statements? What was their representation supposed to have been? Their representation was on January 29th, 2018. Instead of speaking to Qualcomm investors about possible regulatory delay going forward, they should have said, by the way, we have hired Covington and Burling, who are now approaching CFIUS, even as we speak, to actually take a look at this deal ahead of time. So notwithstanding the fact that 31 CFR 800.802 has confidentiality as the default, and notwithstanding that there could be national security reasons for confidentiality, you're saying that there was an obligation on their part to affirmatively disclose that they had initiated contact with the agency? Well, let's remember the CFIUS review typically happens at the end of a merger deal such as this, when the parties have agreed upon the deal. The parties approach CFIUS together and ask CFIUS to look at it. They concern CFIUS has. In this case, in our brief points out, Qualcomm did have the right, as the initiator of the review, to actually publicly acknowledge that the review had- Yes, they had the right to do it. They had the right to go public. But why is not going public in some way making a false statement? I mean, I don't see any statement of theirs that you've seen as saying we're in no contact with CFIUS. Is there something in the operative complaint that you can point me to as to a representation that can be looked at as false with regard to that issue? Two points in response, Judge Bennett. First of all, I believe what your honor is asking for is the same thing that the district court asked for, and that was mirror image falsity, which is not required under either the case law or the plain text of the 1934 security legislation. I agree with that, but that would certainly satisfy your obligation, right? But let me give you an example of just three statements that they made. Here are three statements that they made that were misleading. On February 26th, six days after the CEO of Qualcomm goes to meet Treasury Secretary Mnuchin in Washington, D.C. secretly, the defendants issue a press release claiming that they had made further progress on key issues. They attached a marked up merger agreement that they had sent to the CEO of Broadcom, and they said that if Broadcom agreed to that markup, it would, quote, resolve all issues between the two companies other than price, end quote. And that's in the record at excerpts of record 138 to 139. But what is it about that, that I'm having trouble understanding your falsity argument, why can't a company both have national security concerns, but if there's not going to ultimately be a regulatory problem, want to look out for the best interests of the company and the shareholders and get the best deal they can, even while publicly stating, we don't think this is a good deal, but we're still going to negotiate in good faith. Why are those two things such that having them both going on at the same time is securities fraud? Well, Judge Bennett, they repeatedly told the market, they repeatedly told Qualcomm investors that they remained engaged with Broadcom. They remained ready to engage with Broadcom, both before and after the March 6th shareholder meeting that they hoped CFIUS would delay. On January 29th, the same day of the CFIUS filing, Qualcomm issues public statements warning about possible delay from regulatory approval. Well, warning about possible delay from regulatory approval when you have just secretly approached one of the main regulatory agencies and asked them to step in and take the Haley's Comet unusual step of taking a look at this deal without even telling your counterpart to the deal that this is going on, that you have done this, that is misleading, Your Honor. Misleading to the shareholders of Qualcomm, to the shareholders of Qualcomm, to the shareholders that want the hostile takeover. Exactly. Now, let's not forget, back in 2015, Qualcomm shareholders seeing Qualcomm's share price in the doldrums, they had forced Qualcomm leadership to remove a poison pill that would have, that helps to stave off hostile takeovers like the one Broadcom was suggesting. This approach to CFIUS was itself a quasi-poison pill. You know, financial, this is not just the plaintiff's counsel speaking here, Your Honor. Financial media that were following this all along, they were cheerleading this, the merger between the two companies. They were talking about how eventually when it became apparent that CFIUS was looking at it on March 5th and 6th, nonetheless, they still were cheerleading the deal saying they didn't think there was going to be a problem ultimately because Broadcom had already announced its intention to re-domicile from Singapore back to the United States. Counsel, I'm looking at their January 23, I'm not sure if it was a press release exactly, but it's in the supplemental excerpt of record and I'm looking particularly at SER 12. We believe the transaction and investitures that may be required will be closed by regulatory agencies, will be closely scrutinized and may result in significant national security concerns that could potentially block the transaction. Therefore, in bold, we believe approval by CFIUS is far from assured. Was that a false and misleading statement as well? It was misleading for the fact that in that very same statement, they muddled the message. They also gave reassurances to the investors that Broadcom had, quote, says there will be no issue in obtaining national security clearance from CFIUS and the market knew that Broadcom had already successfully passed CFIUS scrutiny with its acquisition of the Brocade company back in November 2017. So, what did they need to add to the statement I read or to that whole document to make it not false or misleading? Would they have had to have said, as you said before, we're talking or going to talk to CFIUS? Would they have had to have said that? A couple of things they would have had to have said, Judge Bennett. They would have had to have said, you know what, earlier this month, earlier in January, we just hired Covington and Burling, who are CFIUS specialists, to come in and lead our lobbying efforts against this deal. Let's not forget, when they made proxy statements a month or two later in early March, explaining, detailing the three law firms that they had working with them on this deal with Broadcom, they listed Paul Weiss. They listed DLA Piper. They listed Cravath. They deliberately concealed the identity of Covington and Burling, knowing that the financial analysts watching this would latch onto that. So, that morning on January 23rd, in addition to what they said, where they had to acknowledge that CFIUS did not see a problem, they would have had to have said what I just mentioned about the law firm. And they probably should have mentioned that, you know, six days from now, we're actually going to submit this paperwork to CFIUS and get them to do the highly unusual act of looking at this deal ahead of time in order to stave off the deal's completion. So, it was okay if they would have told everybody that this is what they were doing. I mean, my problem is, is it because they didn't tell anybody or that they shouldn't have told anybody? The problem having, you know, it's axiomatic in securities law. You know, they could have kept silent. They could have just dealt with Broadcom and let the the media and financial analysts watch from afar. But instead, they kept on releasing press releases and proxy statements. And having addressed those subjects of regulatory scrutiny, possible delay, and whether or not... Okay, so wait a minute. So, what I'm hearing you say is everything they did was okay. They just should have told people what they were doing. Yeah, there's no problem with them acknowledging that there are regulatory risks out there. There's no problem with them acknowledging that they think Broadcom has undervalued Qualcomm, although when you look at the stock reactions at the time, the market didn't think so. They thought it was a great deal. But having addressed those subjects, you know, having broached the subject, they were under a duty to come clean. This court has said so in many, many cases. But if they come clean, what happens in this case ultimately is what would have happened as they did what they did, right? I mean, what would the difference in the result be? We don't know that, Your Honor. We don't know. Well, as soon as the market found out that CFIUS was interested in it and might not approve the deal, the bottom fell out of the deal. So, what difference does it make whether they tell everybody what they're doing and not telling everybody what they're doing? Well, Your Honor is looking at whether or not something would be inevitable. But the focus here is on the shareholders. Okay. But they would have needed to know. And this was a fraud upon them at that point. Because they didn't follow what they were doing. Were shareholders surprised? Counsel, were people surprised that CFIUS was involved? That CFIUS would review this? I want to put a finer point on it, Judge Bidey. They would not have been surprised to see CFIUS eventually get involved at the end of the process. They were very surprised, all right? I mean, a former CFIUS member called it Haley's Comet unusual. They were very surprised to see CFIUS come in at the beginning of the process before a deal had even been reached and agreed upon. And in the meantime, of course, Qualcomm is telling its shareholders, we're moving forward with this. The only sticking point is price. So the market looks at that. And as we've explained in the briefs, the market prices Qualcomm's stock. And that's the second question that I have. As I reviewed your second amended complaint today and went through all of the statements, I was struck by a consistent pattern in what Qualcomm issued. There seemed to be two elements to everything they said. Number one was we don't like the price. We don't think it captures the value of Qualcomm. And number two, we think that there are regulatory hurdles. And so we don't want to go down this road if it's just going to blow up at the end. It costs everybody a lot of money. Let's go to that first point. They complained about price all along. What do you think would have happened here if Broadcom had offered $100 a share? Do you think that Qualcomm might have found it within itself to go to CPS and said, we think that the national security concerns are overstated, or we think that we can do a workaround on this? It may cost us some money and take us some time, but we think this is probably going to be a pretty good deal at $100 a share? Or is this price inelastic that the powers that be at Qualcomm were determined to scuttle this irrespective of price? It's that point, Judge Bybee. I believe it wouldn't have mattered. We believe it would not have mattered what Broadcom had offered. The price always would have been too far. Remember, the intent behind this approaching CFIUS was to scuttle this deal. The intent behind this was to solidify and keep their power in the company. They knew from early proxy voting- And they would have scuttled the deal even at $200 a share? I can't speak to that, Judge Bybee. May I reserve the rest of my time, please? Yes. Well, good afternoons, Judge Bybee and Battalion, and aloha. I think it's still good morning for you, Judge Bennett. It is. My name is Koji Fukumura, and I represent the defendants at police in this matter. I'm going to start with falsity first, because I think it hopefully answers a lot of the great questions you asked. So plaintiffs don't complain that defendants made any affirmative misrepresentations. And Judge Bybee, you're right that the operative part of the complaint are paragraphs 196 to 231. That is the so-called material misstatements and omissions. It's at ER 131 to 145. That's the operative part of the complaint. And so they don't say anything in there is affirmatively wrong. Instead, they argue an omission, okay, which is that Qualcomm and the omission, let's be clear about what the record shows, is that Qualcomm sent a notice, a lawful notice that is expressly authorized to send under federal law in the very circumstances that are present here, which is you have a hostile bidder. And Judge Bennett, I think you pointed out, it's a confidential submission. And as my colleague pointed out, I suppose a company could make a disclosure, but let's take the next step. There's nothing in the federal securities laws, rules, or regulations that require disclosure. And there's nothing in the federal   rules governing Form 8K, Form 10Q, or in this case, virtually all the statements that were made publicly were filed on Form 14A. And why is that important? Because they're proxy materials. There was a proxy war going on between Broadcom on the one hand and Qualcomm on the other. So there's nothing required by law to make a disclosure. So what they're really saying is, oh, wait, you made an omission. And by making, and by not talking about this during the class period, you've violated the federal securities laws. And counsel, let's say there were some hypothetical, obviously not part of the record, in this case, email among the defendant's top management that said, you know, we're saying all this stuff. And it's all true, but except some of the stuff about negotiation, but no matter what, no matter what they do, $100, $200, $300, we're going to oppose this every step of the way, because we're entrenched and we never, ever want to let this thing go through. If that hypothetical existed, would the plaintiffs have enough of a case to get to the jury here? I think you're pretty close. I think you're pretty close. And what's absent here, what's absent here, the plaintiff's argument is based on hindsight. It's on conjecture. They haven't pointed to a single fact, a single well-plaid fact in this complaint that anyone at Qualcomm or Qualcomm's board refused to negotiate in good faith. In fact, there are really two sort of pivotal periods in this operative section of the complaint that begins on January the 29th and ends really with the last sort of substantive negotiation, which is on February 26th. And those two kind of operative events are a meeting on February the 14th between the parties and a negotiation that took place there. And after that, on February the 16th, there's a series, a beginning series of disclosures about what happened at that meeting. So let's just think about that. What they're really disclosing are here's what you said, here's what I said, here's what I want, here's what you refuse to do. So you have to think about all these statements in context. These are statements about the ongoing negotiations, about why you should vote for us and not for them. They're never intended to be just, you know, a recitation of all the risks. This is not a 10K risk factor exercise. And so, and then let me just pause there because it's very important to focus on the risks that are identified during the class period. Judge Bennett, I think it was you that talked about a January 23rd statement, and I'm not running away from that statement. I'd love to talk about it, but it's not a statement made during the class period. And even if it were, even if it were, in order for it to be an actionable statement, right? The omission of a notice to CBS, hey, Broadcom is soliciting proxies. It's a foreign person. It's soliciting proxies to take over our company. You should know about it. That's what the notice is. What happens a couple of intervening events later is that President Trump, in response to a notification from CFS who sent that because Broadcom in three ways violated an interim order on March the 14th killed the deal. We can't jump all the way there, but if we look at the class period statements, you know, judges as preparing for this, you know, judge bench of angles question. And I think one of your questions kept ringing in my ear, please, between paragraphs, 196 and 231 point to me a single paragraph that is affirmatively rendered misleading by the omission of information. And, and, and I'd like to, to sort of really hammer the point here. Let's talk about the cases they cited in Burson applied signals, how did its backlog and the these paragraphs are false in paragraph 231, for example, the plaintiffs allege that defendant statements misled investors to believe that Qualcomm was willing to engage constructively. And their argument is, and it may not be sufficient, but their argument is that all of was a charade and they were never willing to engage constructively because at the end of the day, there was nothing that we could do that could cause them to agree. And so all of the suggestions that they were willing to engage constructively were either false or at best misleading. What's the, what's in your view, the problem with that argument, where in a non-securities case, looking at the inferences drawn from the evidence in the light, most favorable to the non-moving party that might get them to the jury. I really glad you brought that up because that, that sort of encapsulates the whole problem with plaintiff's entire argument. Your honor just identified an argument. Your honor didn't focus on any facts that argument in paragraph 231 is premised on what occurred on paragraph 229 and 230. And what happened in those paragraphs are that what that reveals is negotiation, negotiation in good faith that Qualcomm and Broadcom, this is the February 26th disclosure they met on February the 23rd. And during those both parties made important concessions and then Qualcomm gave a red line of the merger agreement. Okay. And says, here are things that are really important to us that impact deal certainty. Now, so I, I need to pause right here. These are two companies that have, have a rich history, a decades long history with NHS regulators throughout the world. So that's number one. Number two, this was going to be the largest technology transaction in history. And it, you know, these combined companies, this combined entity would have hundreds of thousands of patents. Some of them, many of them standard setting patents. This was going to, and Qualcomm has been in, in very public and Broadcom as well, fights with the federal trade commission, with MOFCOM, the, the FTC in China, with KFTC in Korea, with the EU. This whole exercise, once we sign this deal and work on all the things that we need to do to get regulatory scrutiny, it's going to be, they're going to be significant. And during this period, if you look back at what happened on February the 13th, February the 14th, there was Broadcom was refusing to budge on a lot of these issues. So the only facts that are in the complaint are literally, if you look at the bolded italicized materials, not their argument about those, the, the, when you look at the facts, Broadcom was negotiating at all times, was making concessions and had provided a red line in, in that red line, they made additional demands. And by the way. Had Qualcomm ever provided a price? Well, Qualcomm's not going to bid against itself. This is, and the acquirer will usually come forward. Well, but, but, but did, did, did Qualcomm ever put a number on the table that, you know, if we can, if we can get past regulatory approval and resolve the non-money issues, this is a number which we would recommend. Yeah, the, well, the answer to that is it's not on the record. And the other answer is. Okay, well then, then that, that, that's all the, that answers my question. It's not on the record. And the other answer is that generally in M&A transactions, it's particularly here. So let me pause right here and, and talk about what was going on at the company. Why Broadcom, Qualcomm board thought that the price was so materially undervalued. And this is in the complaint. And there were, there were a couple of things that, that the defendants mentioned. The first is the Apple litigation. The second is the FTC litigation. And the third thing that the CEO said is that, that Broadcom hasn't appropriately put value on, on our 5G technologies. And, and if they want to play the hindsight game, then we can play the hindsight game too. The company's currently trading at $165 per share, which is $88 per share, more, more than, than they argued it's, it's got more than twice the value now that all of those issues are behind them. So, so maybe, maybe looking back at it now in, in terms of what the value would be years on, maybe you were right, but the market at the time wasn't agreeing with because what they were offering was significantly in excess of the then share price, right? It could have been, but that doesn't mean the Qualcomm board and Qualcomm management certainly had a firm belief that they weren't violating the antitrust laws and that they would ultimately prevail in both the Apple and FTC litigation. And that they had an absolute belief in the fact that they would be a leader in 5G. And that's what they thought. And by the way, look, the combination of these two companies, while exciting and it could be terrific, the fact is that Broadcom refused to budge. And I have, I suspect they refused to budge on price because they thought they could just take over the board and they could set their own price once they control Broadcom after March the 6th. But I do want to take a step back because I want to make sure that we focus on the fact that there's no statement. They have to identify a statement that we made, sorry, that Qualcomm made that was materially misleading. They talk about generalized, right? Oh, there's regulatory risk. Oh, there's, you didn't argue in good faith, but there's not a single well-pled fact that, as I said, that Qualcomm wasn't negotiating good faith. There's no confidential witness that says, hey, just as you described, Judge Bennett, there's no way we're going to do this deal at any price. There's nothing like that. There's no whistleblower like in the bank of the internet. There's no, I mean, there's just nothing here that would suggest factual, not this look in hindsight, oh, the deal was ultimately killed by the president of the United States after a series of intervening events go. And then the same thing is true about this regulatory risk. And this is really important. All of the risk warnings pointed in one direction, one direction, there's risk here. And the risk is many fold and not the least of which, if you look at the class period statements about risk, they're mostly about antitrust risk. And the only time CFIUS is ever raised is in antitrust risk. If you look at that paragraph in 208, it is talking about the divestment of assets in negotiations with antitrust regulators. And so this assumes a deal is done. And even if you have a deal, we're still going to be talking not only to antitrust, but to national security as well. So the question is, what was by not saying, oh, by the way, we sent a notice to CFIUS, which I think Judge Battaglia, you noted, or Judge Bobby, you noted that when the market learned that CFIUS was involved, nothing happened. On February 26th, when they say this such a significant event happened, there was a whimper, nothing, the stock didn't move. Of course, the public was aware that this was going to happen. And on that day, not only was the public told that CFIUS was looking into the situation, but that Senator Cornyn, the number two ranking senator in the Senate, was exhorting CFIUS to review the situation prior. Counsel, why don't you conclude? Okay. Well, Your Honor, the only other thing I'll say is, you know, when we've all been struggling with the question of, boys, there are even a material misstatement. If during the hearing, my friends at Robbins Geller couldn't identify a single paragraph where there was a misstatement, how is it possible that this, the omission was so obvious that it constituted a highly unreasonable omission? All right. Thank you. Thank you, counsel. I think we have your argument. Counsel, you have some rebuttal time left. Thank you, Your Honor. Two quick points. And we'll go ahead and we'll give you two minutes. I appreciate that. Two quick points and a minor housekeeping item. The minor housekeeping item, Judge Battalion, I think one of your questions was asking about shareholders being damaged. The existing shareholders of Qualcomm saw the price go down, of course, but we represent people that purchased into Qualcomm before the stock dropped. Now, the two points. Counsel said, nothing in the CFR, nothing in securities law requires disclosure. That is 180 degrees away from the law. If Your Honor would look at the Schoonerman case from this court, 840 F 3698, that case discusses at length the duty of a defendant in a securities fraud action, who having deigned to address a subject, then has a duty to speak fully and not misleadingly on that subject. And the panel there led by Judge Bybee specifically cited the Burson case, as well as the Supreme Court case in Matrix, which all make the same point. So there's plenty of case law out there that says there is a duty of disclosure, even though there may not be one statutorily. The second major point. Counsel said, nothing in the complaint shows that we didn't act in good faith, especially on February 26th. How can you say on February 26th that here's a markup of the proposed merger agreement, where it would resolve everything other than price, knowing that you've already got CFIUS looking at this, which you haven't told anybody about, and that just six days before your CEO secretly flew to Washington, D.C. and met with the chairman of CFIUS, of the very agency that you are imploring to take a look at this. So in one final little point, there's been a lot of talk about what happened afterwards, how Qualcomm's doing these days. Who cares? I don't care if its stock price is $300. The snapshot is what was happening at the time. And in that Schuenemann case, I would note, where a lot of the dispute was around this drug called locasorin. Well, the FDA actually ultimately signed off on locasorin. But that did not mean that the defendant's statements in that particular case at the time were false and misleading. So, your honors, I think if you take a look at the allegations of the complaint. Counsel, why don't you conclude? If you accept them as true, as is required at the pleading stage, and get the inferences from them also as required at the pleading stage, we've at least stated a claim for securities fraud. Let us get this to a jury and then we can sort out the fraud. Thank you very much, your honors. All right. We thank counsel for their arguments and the case just argued has been submitted. We will now
judges: BYBEE, BENNETT, Bataillon